UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SIDNEY JOHNSON, | * | CIV 10-4052-RAL |
| | * | |
| Plaintiff, | * | |
| | * | OPINION AND ORDER |
| -vs- | * | VACATING AND REMANDING |
| | * | THE COMMISSIONER'S DECISION |
| MICHAEL J. ASTRUE, | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

Plaintiff Sidney Johnson seeks reversal of Defendant's decision denying Plaintiff's

application for social security disability insurance ("SSDI") benefits under 42 U.S.C. §§ 401-34.

Alternatively, Johnson requests the Court to remand Defendant's decision for a hearing on all of the

issues now raised by Plaintiff.[1] For the reasons explained below, this Court vacates the final decision

of the Commissioner of Social Security and remands to the Social Security Administration for

further consideration of Johnson's application consistent with this opinion.

**I. Procedural Background**

On March 7, 2007, Johnson filed an application for SSDI benefits alleging disability since

birth - and later amended the application to allege a disability onset date of March 12, 2002 - due to

severe arthritis of the feet and back, premature birth and residual brain damage, seizure disorder as

---

[1]Johnson entitled his appeal a "Motion for Summary Judgment." As per a Standing Order
of this Court filed on December 5, 2000, "summary judgment" is not the appropriate term for
disposition of social security appeals in this district. That order specifies that, upon plaintiff
filing a complaint and the defendant's filing of an answer in a social security matter, the court
will enter a briefing schedule and make a determination concerning the Commissioner's decision.
The Court entered such a briefing schedule (Doc. 6), and Johnson's appeal is ripe for decision by
this Court.

a child, and continual developmental disorders. (AR[2] 33, 67-69, 125). During subsequent administrative proceedings, Johnson made reference to additional alleged ailments, including leg length discrepancy, curvature of the spine, right shoulder pain, autism, depression, and anxiety. (AR 40, 43, 45, 46, 146, 159). Johnson's claim was denied initially on July 19, 2007, and again upon reconsideration on December 10, 2007. (AR 69-71, 75-76). On January 10, 2008, Johnson requested an administrative hearing. (AR 77-78).

Johnson received a hearing before Administrative Law Judge ("ALJ") Lyle Olson on March 2, 2009. (AR 16). The ALJ issued a "Notice of Decision - Unfavorable" on June 5, 2009. (AR 13-15). On June 29, 2009, Johnson appealed the ALJ's decision and requested review by the Appeals Council. (AR 8-12). On April 27, 2010, the Appeals Council denied Johnson's request for review. (AR 1). Johnson then timely filed his Complaint (Doc. 1) in this case on May 10, 2010.

## II. Factual Background

### A. Johnson's Background, Education, and Work Experience

Johnson was born on December 14, 1960. He completed high school through a curriculum comprised both of regular and special education classes. (AR 35). His past relevant work history consists of a single job as a school janitor from October of 1984 until his termination and alleged disability onset date on March 12, 2002. (AR 40-41). He was 41 years of age as of his alleged disability onset date and 48 years old as of the date of the ALJ's decision.

Since his termination from the janitorial position, Johnson has worked part-time at a church and part-time at a Hy-Vee grocery store. (AR 37-38). Johnson earns $9.90 hourly from his part-time

---

[2]Citations to the appeal record will be cited as "AR" followed by the page or page numbers.

position at the church, where he receives a daily job list instructing him which tasks to perform and is required to log the time spent completing each task. (AR 37-38). Johnson received both wage subsidies and special accommodations at his job at the church, according to Pastor Ed Anderson, (AR 163), and he has received assistance from a job coach. (AR 193).

At Hy-Vee, Johnson works fifteen hours weekly and earns "$7-something" hourly. (AR 38). His duties at Hy-Vee consist of retrieving shopping carts from the parking lot, stocking groceries, cleaning bathrooms, vacuuming his boss's office, filling vending machines, bagging groceries, and picking up garbage while walking around the store. (AR 39). Johnson noted difficulties bending down to the floor when performing some of these duties, though he admittedly can bend over and touch his knees without experiencing pain. (AR 39, 59). Johnson can lift pet food bags and 40-pound salt bags at work, but doing so bothers his arms and shoulders. (AR 58). Despite being allowed a ten-minute break at his Hy-Vee job, Johnson testified that he is not able to take such breaks because of customer demand for grocery bagging. (AR 43).

At the hearing before the ALJ, Johnson testified that he lives by himself at a house in Vermillion paid for by his parents, has never married, has no children, and cares for a dog. (AR 33-34). Johnson is right-handed, does not use a cane, and has never had a driver's license. (AR 34, 36). Johnson professed capability in simple addition and subtraction but difficulty balancing a checkbook. (AR 36-37). He testified that he can prepare basic meals, wash his clothes, and take out his garbage. (AR 56-57).

When asked about the circumstances leading to his termination from the prior job at the high school, Johnson responded that he experienced difficulties adjusting to a new boss. (AR 40). Johnson testified:

-3-

> Well, I got a new boss and he really didn't understand, you know, the situation, you know, my autism and he started, you know, changing the way I was doing things, you know for years. And, you know, just really hard, you know, for me to change the way things are – doing things one way and you change it and it's just really hard for me."

(AR 40). Johnson said that, despite his efforts to find a new job, he was unemployed for a full year after losing the high school janitorial position. (AR 41). He said he applied to work at the University of South Dakota "like twenty-two times." (AR 41). In addition, Johnson testified that he did not file for unemployment, did not have health insurance, and lived off his savings when he was not working. (AR 41).

The ALJ also asked Johnson about his medical history. Johnson testified that he had not had any seizures since the 1980s and was not taking any seizure medication. (AR 41-42). When asked about his legs, Johnson said that his left leg was shorter than his right leg. (AR 43). He also stated that he has arthritis in his back and curvature of the spine, which causes back pain. (AR 43-44). Other medical issues Johnson mentioned were arthritis in his feet, knee discomfort, and right shoulder pain. (AR 43-45). For the shoulder pain, Johnson said that, although the pain is constant, physical therapy and electric shock therapy have helped. (AR 45).

## B. Medical Evidence before the ALJ

Dr. William Dendinger, M.D. is Johnson's primary care physician. (AR 261-95, 380-404). The earliest treatment records in the administrative record stem from an April 27, 2005 pre-operative examination concerning a right inguinal hernia. (AR 278, 293). The treatment notes document a history of a left inguinal hernia requiring surgical repair in August of 2000 and July of 2001. (AR 278). Johnson reported periodic pain in his arms and legs as well as back discomfort. (AR 277). Dr. Dendinger noted, however, that Johnson had no areas of back discomfort. (AR 277). The

-4-

examination also documented bilateral foot pain. (AR 276). Dr. Dendinger performed the hernia repair surgery on May 2, 2005 (AR 295), and on May 11, 2005, Dr. H. Lars Aanning noted that Johnson's right inguinal hernia repair was healing well. (AR 292). On June 22, 2005, Dr. Dendinger treated Johnson for some right upper quadrant discomfort and tenderness, borderline high blood pressure, and borderline low platelet count. (AR 272). A June 24, 2005, gallbladder ultrasound showed that Johnson had cholelithiasis. (AR 282-83). On June 29, 2005, Dr. Dendinger examined Johnson for a possible gallstone. (AR 291). Johnson denied any symptoms and Dr. Dendinger recommended against a laparoscopic cholecystectomy as Johnson was preparing for a new job. (AR 291).

On September 26, 2006, Dr. Dendinger examined Johnson for reported right-side pain from lifting a table and referred Johnson to another physician to evaluate a possible recurrence of a right inguinal hernia. (AR 269-71). Dr. Aanning suspected that Johnson's lifting at work aggravated his hernia repairs and that Johnson was at risk for further complications if such lifting continued, so he restricted Johnson's lifting to twenty pounds for the following week. (AR 268). On November 8, 2006, Johnson was told that he gradually could return to his full lifting schedule at work. (AR 267). On January 5, 2007, Dr. Dendinger found that Johnson had no areas of discomfort and advised Johnson that he could return to full-duty work. (AR 264, 399). On March 7, 2007, Dr. Aanning recommended a cholecystectomy and surgical consultation. (AR 263, 398). A cholecystectomy was performed to remove Johnson's gallbladder on March 12, 2007. (AR 294).

In October of 2007, Johnson was seen to discuss diagnoses of autism, hypertension, and depression. (AR 395). Dr. Dendinger prescribed Lexapro for the depression and Toprol for hypertension, but Johnson stopped taking the Lexapro due to insomnia. (AR 394-95). On October

29, 2007, Dr. Dendinger noted that Johnson's hypertension was "in good control." (AR 394). As a result of Johnson's reluctance to take Lexapro for his depression, Dr. Dendinger prescribed Effexor XR on November 12, 2007. (AR 392). However, Johnson also quit taking the Effexor XR after a few days because of complaints of gas and insomnia. (AR 392).

Also on November 12, 2007, Johnson reported right forearm and elbow pain that Dr. Dendinger characterized as "likely tendonitis" and tennis elbow resulting from his work at Hy-Vee. (AR 391-92). Dr. Dendinger examined Johnson again for depression and arm pain on January 28, 2008. (AR 387). At that time, Dr. Dendinger noted that "the tennis elbow area is really not giving him much for discomfort" and that Johnson did "not want to take any medication for depression" because he never felt well when taking such medications. (AR 387-88). In March of 2008, Johnson indicated that his arm pain had "resolved," and Dr. Dendinger noted that Johnson's depression "appears to be improved." (AR 385-86).

On June 9, 2008, Johnson returned to Dr. Dendinger and complained of bilateral upper arm discomfort related to lifting groceries at Hy-Vee. (AR 384). Dr. Dendinger noted that Johnson had full range of motion in both arms, but with discomfort. (AR 384). Dr. Dendinger prescribed analgesic cream, warm water soaks, and use of an armband. (AR 384). Johnson saw Dr. Dendinger again on September 24, 2008, with complaints of right upper arm pain. (AR 383). Johnson indicated that he had been experiencing right arm pains since November of 2007 or earlier, originally in the elbow area and then toward the shoulder area. (AR 383). Johnson attributed the arm pains to extensive use of his arms at Hy-Vee. (AR 383). The use of creams and over-the-counter pain medications did not resolve the pain. (AR 383). Dr. Dendinger suspected overuse syndrome due to excessive use of the shoulder at work, prescribed physical therapy and Feldene, and ordered an

x-ray. (AR 383). Dr. Dendinger's treatment notes say that the x-ray did not show any specific abnormality (AR 383), but the radiology report noted "minimal AC and glenohumeral degenerative joint disease." (AR 402). Johnson again noted shoulder discomfort during a January 16, 2009 exam, during which he also noted discomfort in his legs, feet, and lower back. (AR 382). Dr. Dendinger's exam notes also stated that Johnson's "autism surely is a disabling factor in this even though it is not disabling him completely but he clearly does need some assistance." (AR 382).

Following the January 16, 2009 exam, Dr. Dendinger wrote a letter to Johnson's lawyer concerning Johnson's history of developmental concerns, including premature birth, delayed development, and ultimate diagnosis of autism. (AR 380). Dr. Dendinger wrote that autism has been a "significant disability" limiting Johnson's ability to obtain and maintain full-time employment, and that he was "hopeful that [Johnson] would be able to obtain some assistance because of this disability." (AR 380).

Johnson was seen by a podiatrist, Dr. Scott Shindler, on August 20, 2007, due to pain in both feet. (AR 374-75). The exam showed weakened muscle strength in plantar flexion, dorsiflexion, inversion, and eversion, as well as some limited range of motion at the midtarsal joints and metatarsophalangeal joints, indicating some arthritis in those joints. (AR 374-75). Johnson had full range of motion at the ankles and subtalar joints. (AR 324, 374-75). Gait evaluation revealed severe bilateral pronation and some pain upon palpation. (AR 374-75). Dr. Shindler's assessment included limb length shortage of Johnson's left leg, pain, tendonitis, and arthritis. (AR 374-75). Dr. Shindler found that Johnson had a biomechanical imbalance in both feet that affects muscle strength and limits the time Johnson can stand or walk on his feet before experiencing pain. (AR 374-75). Dr. Shindler wrote that any type of job requiring long periods standing or walking would cause Johnson

-7-

pain in both feet, and he recommended prescription orthotics to control the biomechanical imbalance and for reduction of pain and inflammation. (AR 374-75). He noted, however, that due to the biomechanical imbalance present in both feet it would be difficult for Johnson to have a job requiring considerable standing or walking without causing pain. (AR 375). When Johnson's attorney contacted Dr. Shindler in November of 2008 to inquire for more detail about the limitations documented in Dr. Shindler's August 20, 2007 treatment notes, Dr. Shindler responded that Johnson would be limited to fifteen or twenty minutes standing at one time before needing to sit, and that Johnson's total standing time in an eight-hour work day should be less than two hours to avoid pain. (AR 376-77).

On February 17, 2007, Johnson was referred for a psychological evaluation and testing by vocational services to Dr. Galen Van Kley, a clinical psychologist. (AR 254). Dr. Van Kley's report concluded that Johnson's intellectual limitations and emotional struggles indicate that he may meet criteria for having a significant disability based on Department of Rehabilitative Services criteria. (AR 258). Johnson's overall intellectual functioning was in the borderline range, likely due to some prenatal brain injury and his seizure history. (AR 257-58). Johnson responded in an exaggerated manner to Personality Assessment inventory items, however, so his profile was not likely to be an accurate reflection of his personality functioning. (AR 257). Dr. Van Kley stated that Johnson has difficulty using common sense to recognize social conventions and has trouble problem-solving in novel situations, limiting his capacity to find appropriate and adaptive solutions to everyday problems. (AR 257). Dr. Van Kley stated that this might have contributed to the events leading to Johnson's termination at his custodial job at the high school and difficulty obtaining new full-time employment. (AR 257). Dr. Van Kley also noted that Johnson becomes markedly anxious in

situations involving critique of his performance and that Johnson would benefit from written instructions when learning new employment responsibilities. (AR 257). Due to Johnson's intellectual limitations, Dr. Van Kley deemed Johnson best-suited for jobs involving considerable repetition and a minimum of novel problem-solving. (AR 258). Dr. Van Kley recommended psychiatric consultation and continued therapy for Johnson. (AR 258).

Johnson met with Brittany Schmidt, the Director of the Autism Spectrum Disorders Program Clinic at the Sanford School of Medicine Center for Disabilities on September 11, 2007. (AR 349-52). Present at the meeting with Schmidt were Johnson, his parents, and his sister. (AR 349). Schmidt utilized autism-specific instruments completed by Johnson's parents and sister, an interview with Johnson's parents and sister, an interview with Johnson, a review of Dr. Van Kley's IQ test report on Johnson, and the Gilliam Autism Rating Scale. (AR 350). From these instruments, Schmidt endorsed that Johnson exhibits intermittent eye contact, rapid movements, unusually flat vocal quality, repetitive speech patterns, a tendency to not ask for things he wants, and inappropriate answers to some questions. (AR 351). However, during his interview with Schmidt, Johnson "demonstrated appropriate greeting responses coupled with appropriate eye contact," answered questions appropriately, and found humor in certain topics. (AR 351).

Schmidt noted that Johnson's affect does not match his emotional level, he becomes physical if frustrated with a situation, he withdraws or acts aloof in social situations, and he usually does not give affectionate responses to people he loves. (AR 351). Johnson reported to Schmidt that he follows daily routines and prefers the company of animals to people, as he feels that animals better understand him. (AR 351). Johnson also reported that he could play the piano by ear with perfect pitch and had an "incredible memory for details" for trivia and television shows and characters. (AR

350).

Schmidt concluded that Johnson exhibited a developmental pattern consistent with autism and that he currently and formerly met the diagnostic criteria for autism. (AR 351). On November 25, 2008, Schmidt stated that Johnson had qualitative defects in all three areas of the social security listing for Autistic Disorder, § 12.10, and Johnson had marked restrictions of activities of daily living and maintaining social functioning. (AR 379).

State agency mental health experts twice assessed Johnson's mental limitations by reviewing his medical records to complete the standard Psychiatric Review Technique form and the standard Mental Residual Functional Capacity ("RFC") Assessment form. (AR 297-314; 354-71). On July 12, 2007, Dr. Jerry Buchkoski found on the Psychological Review Technique form that Johnson possessed medically determinable impairments, including cognitive disorder not otherwise specified ("NOS"), depression NOS, and anxiety disorder NOS. Id. Dr. Buchkoski found that Johnson had mild limitations in activities of daily living; moderate limitations in maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation. (AR 307). On the Mental RFC Assessment form, Dr. Buchkoski found moderate limitations in Johnson's ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and to interact appropriately with the general public. (AR 311-12). Dr. Buchkoski noted that Johnson "has limited intellectual skills as a result of birth complications." (AR 313). He also noted that Johnson had performed substantial gainful activity for 18 years but has been unable to obtain full-time employment since losing his job, which caused depression and an anxious mood. Id. Dr. Buchkoski further observed that Johnson "feels that he can work full time but he is not given a chance to prove himself as he is

-10-

not hired." Id. Dr. Buchkoski ultimately concluded that Johnson "has the ability to work as shown by past performance" and that Johnson's mental RFC "is judged as being consistent with past work." (AR 313).

The second state agency mental evaluation occurred on December 5, 2007, after the September 11, 2007 medical diagnosis of autism had been added to Johnson's file. (AR 353, 370). On the Psychiatric Review Technique form, Dr. Stephanie Fuller found medically determinable impairments, including cognitive disorder NOS, adjustment disorder with anxiety and depressed mood, and autistic disorder with medically documented qualitative deficits in reciprocal social interaction, qualitative deficits in verbal and nonverbal communication and in imaginative activity, and markedly restricted repertoire of activities and interests. (AR 357, 359, 363). Dr. Fuller found that Johnson had mild limitations in activities of daily living; moderate limitations in social functioning and maintaining concentration, persistence, or pace; and one or two episodes of decompensation. (AR 364). On the Mental RFC Assessment form, Dr. Fuller found moderate limitations in Johnson's ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond to changes in the work setting. (AR 368-69). Dr. Fuller concluded that Johnson's mental RFC allowed substantial gainful work activity and that Johnson "will do better with written instructions at a new job." (AR 370).

State agency physicians completed two assessments of Johnson's physical limitations using a standard Physical Residual Functional Capacity Assessment form for the first evaluation. (AR 316-23). Dr. Kevin Whittle completed the first assessment on July 16, 2007, and he concluded that

Johnson had no limitations. Dr. Whittle's rationale consisted of a single paragraph:

> Claimant had inguinal hernia repair in 2005 with good results. Cholecystectomy was done March of 2007 with good results. Report of 3/12/07 states - extremities grossly normal. No obvious sensory or motor nerve deficits noted. Report of 1/5/07 - can return to full duty. There is no subjective mention of foot or back pain in any of the medical reports. Claimant's impairments are non-severe.

(AR 317). On December 7, 2007, Dr. Frederick Entwistle affirmed Dr. Whittle's assessment. (AR 373).

Johnson's hearing before the ALJ occurred on March 2, 2009, in Sioux Falls. (AR 31). Present at the hearing were Johnson and his attorney, Renee Christensen, as well as Dr. Tucker, a vocational expert ("VE") summoned to the hearing by the ALJ. (AR 31). Before questioning began, the ALJ stated that it is clear from Johnson's earnings that he engaged in SGA from 1994 to 2001. (AR 32). The ALJ also noted earnings in 2004 and 2007 that the ALJ stated exceeded the SGA threshold, but he did note the presence of an employer statement in the file that the ALJ described as "indicat[ing] that [Johnson's] actual worth of work was 25 percent of what he was paid," which would be discussed later. (AR 33). The ALJ then stated, ". . . the earliest onset date . . . to be thinking about would be March 12 of 2002, all right? Is there a motion to amend the onset date?" (AR 33). Johnson's attorney then agreed to amend the alleged onset date to March 12, 2002. (AR 33).

Dr. Tucker testified at the hearing as a vocational expert. He concluded that Johnson is not able perform his semi-skilled past work as a janitor but could perform the work of an industrial cleaner (Dictionary of Occupational Titles ("DOT") code 381.687.018 ), a medium-level unskilled job that is another classification of janitor. (AR 62). The other two positions that Dr. Tucker said that Johnson could perform included laundry laborer (DOT code 361.687-018) and grocery bagger

-12-

(DOT code 920.687-014). (AR 61-62). According to Dr. Tucker, none of these jobs are considered "production rate pace make work." (AR 63). Dr. Tucker noted that 43,000 industrial cleaner jobs existed in the regional economy and 2.5 million in the national economy, and 4,800 laundry laborer positions existed regionally and 220,000 nationally. (AR 62-63).

## C. The Disability Determination and the Five-Step Procedure

To determine whether Plaintiff was disabled, the ALJ applied the five-step sequential evaluation process mandated under 20 C.F.R. § 404.1520(a)(4). Under this five-step analysis, an ALJ is required to examine:

> (1) whether the claimant is currently engaged in a "substantial gainful activity;"
> (2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities;
> (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment contained in the listing of impairments (if so, the claimant is disabled without regard to race, age, education, and work experience);
> (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and
> (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). If the ALJ can make a conclusive disability determination before step five, the applicable regulation requires the ALJ to make that determination and not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). If the ALJ cannot make such a determination before step five, the ALJ must evaluate each step. Id. Between steps three and four, the ALJ assesses the claimant's residual functional capacity ("RFC"). Id.

At step one, the ALJ found that Johnson had engaged in substantial gainful activity ("SGA") since his amended alleged disability onset date of March 12, 2002. (AR 19). At step two, the ALJ found that Johnson had an organic mental disorder (borderline intellectual functioning with a verbal

IQ of 84, performance IQ of 78, and full-scale IQ of 79), autism, a depressive disorder, and an anxiety disorder. (AR 20). The ALJ found that these impairments were "severe" within the meaning of the applicable regulations. (AR 20); 20 C.F.R. § 404.1520(c) (defining an impairment as "severe" if it "significantly limits [claimant's] physical or mental ability to do basic work activities"). The ALJ found that Johnson's complaints of hypertension, leg pain due to length discrepancy, past seizures as recently as the 1970s, and upper extremity and shoulder pain did not constitute severe impairments. (AR 20). At step three, the ALJ concluded that Johnson's mental impairments, "considered singly and in combination, do not meet or medically equal the criteria of listings 12.02 [Organic Mental Disorders] and 12.10 [Autistic Disorder]." (AR 20).

After reviewing the evidence, the ALJ then determined Johnson's RFC. (AR 22-26). The ALJ found that Johnson "has the residual functional capacity to perform a full range of work at all exertional levels," though such ability "has been compromised by nonexertional limitations." (AR 22, 27). In support of this determination, the ALJ noted that "[m]entally, [Johnson] retains the ability to understand, remember, and carry-out short, simple instructions, interact appropriately with supervisors, co-workers and the general public, respond appropriately to changes in a routine work setting and make judgments on simple work-related decisions." Id.

At step four, the ALJ found that Johnson is unable to perform his past relevant work as a janitor. (AR 26). However, he found at step five that Johnson could perform other jobs that exist in significant numbers in the national economy, including industrial cleaner and laundry laborer. (AR 26-27).

In ultimately denying Johnson disability benefits, the ALJ, referring to the SGA finding, stated:

-14-

[T]his is the major basis for this denial, claimant performed substantial gainful activity in both 2004 and 2007. This ability, as well as earnings generated in 2003, 2005, 2006, and 2008 clearly reflects a capacity for full-time work within the parameters of the mental residual functional capacity noted above."

(AR 25).

## III. Standard of Review

When considering an ALJ's denial of social security benefits, a district court must determine whether the ALJ's decision "complies with the relevant legal requirements and is supported by substantial evidence as a whole." Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence on the record as a whole" entails "a more scrutinizing analysis" than "substantial evidence," which is merely such relevant evidence that a "reasonable mind might accept as adequate to support a conclusion." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998) (noting that "it is not sufficient for the district court to simply say there exists substantial evidence supporting the Commissioner.") (internal quotation omitted). "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" Pate-Fires, 564 F.3d at 942 (quoting Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006)). "Substantial evidence means more than a mere scintilla." Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Neal v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005)). A district court must "consider both evidence that supports and evidence that detracts from the Commissioner's decision." Pate-Fires, 564 F.3d at 942 (citations omitted). Additionally, "[a]s long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because

-15-

substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (internal citations omitted).

The Court also reviews the Commissioner's decision to determine if appropriate legal standards were applied. See Roberson v. Astrue, 481 F.3d 1020, 1022 (8th Cir. 2007). The district court reviews de novo the ALJ's ruling for any legal errors. Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

## IV. Discussion

Johnson argues that the ALJ's decision was not supported by substantial evidence on the record as a whole and free of legal error. He raises four issues on appeal:

1.  Whether the Commissioner erred by failing to consider wage subsidies and employer accommodations received when determining whether Johnson's earnings constituted substantial gainful activity;
2.  Whether the Commissioner erred by failing to identify and consider all of Johnson's severe impairments;
3.  Whether the Commissioner's determination of Johnson's residual functional capacity is supported by substantial evidence on the record as a whole; and
4.  Whether the Commissioner erred by failing to properly evaluate Johnson's subjective complaints of pain and other symptoms.

(Doc. 11, at 1).

## A. Substantial Gainful Activity Determination

At step one of the sequential evaluation, the ALJ determines whether a claimant is engaging in SGA. If so, the claim is denied, regardless of medical condition, age, education, or work experience. 20 C.F.R. § 404.1520(b). "Substantial gainful activity is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. "Substantial work activity is work activity that involves doing significant physical or mental activities." Id. "Gainful work activity is work activity

that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." Id.

When evaluating whether an individual has performed SGA, consideration is given to how well the work is performed. 20 C.F.R. § 404.1573. If an individual is unable, because of impairments, to do ordinary and simple tasks satisfactorily "without more supervision or assistance than is usually given other people doing similar work," this may show that the individual is not working at the SGA level. Id. If an individual's work is performed "under special conditions that take into account [the individual's] impairment," the ALJ may find that the individual does not have the ability to do SGA. Id. Examples of "special conditions" include: (1) requiring and receiving special assistance from other employees in performing work; (2) being allowed to work irregular hours or taking frequent rest breaks; (3) being provided with special equipment or assigned work especially suited to an individual's impairment; (4) receiving help from other persons to prepare for work or get to work; (5) being allowed to perform at a lower standard of productivity or efficiency than other employees; or (6) being allowed to work because of family relationship, past association with an employer, or an employer's concern for the individual's welfare. Id.; see also SSR 83-33, 1983 WL 31255 (1983) (social security policy statement regarding the procedure to use to determine the actual value of work counted for purposes of determining SGA).

The Commissioner's Program Policy Statement in Social Security Ruling 83-33 requires that after determining an individual's gross earnings, it is necessary to deduct the value of any subsidized earnings provided by an employer. SSR 83-33 permits an employer calculation of the subsidy and states that where an adequate explanation of the subsidy calculation is included, additional development is not necessary. 1983 WL 31255 (1983). Error may occur when an ALJ fails to

-17-

address evidence supporting a conclusion that an individual's earnings are subsidized. See Rossello v. Astrue, 529 F.3d 1181, 1186 (D.C. Cir. 2008) (noting that Social Security regulations require subtraction of subsidy amount from gross earnings when determining whether presumption of SGA is triggered).

Johnson contends that the ALJ erred in finding that Johnson had engaged in SGA since the amended alleged disability onset date of March 12, 2002. The ALJ found that Johnson's earnings statements showed SGA for 2004 and 2007 under 20 C.F.R. § 404.1571 *et seq.*, when he earned $9,941.93 and $10,935.00, respectively. (AR 19). The ALJ did not expressly find whether Johnson was currently engaging in SGA. The ALJ did find that "[t]he claimant has not submitted any evidence to refute" the SGA determination. (AR 19). Johnson argues that the ALJ erred by not deducting the value of any subsidized earnings provided by Johnson's employer when determining whether SGA occurred following the alleged onset date.

Pastor Ed Anderson, Johnson's employer at his part-time church job, testified that the church significantly subsidizes Johnson's pay. (AR 163). Pastor Anderson stated that Johnson receives both assistance and additional supervision in the work he performs, which is not provided to other employees. Id. Pastor Anderson also stated that Johnson's work productivity is worth substantially less than his compensation, other employees in Johnson's same job perform additional duties of which Johnson is incapable, other employees in the same job perform more work than Johnson in the same amount of time, and Johnson receives 25 percent more compensation than the actual value of his work when compared to other employees performing the same duties. Id. Pastor Anderson's testimony is undisputed. Johnson's gross earnings for 2004 and 2007, when averaged, were $828.49 per month in 2004 and $911.29 per month in 2007. (AR 99). The 2004 gross earnings exceed the

-18-

amount considered to be SGA by $18.49 per month for 2004 and $11.29 per month for 2007. See www.socialsecurity.gov/OACT/COLA/sga.html [last visited March 15, 2011]. Applying a 25 percent reduction to Johnson's earnings from the church in 2004 and 2007 reduces his average monthly earnings below the threshold triggering a presumption of SGA for both years. (AR 104).

In his decision, the ALJ never mentioned the subsidy or Pastor Anderson's testimony. The ALJ, however, did mention Pastor Anderson's statement twice during the hearing, saying "[n]ow I'm aware that there are employer statements that indicate that his actual worth of work was 25 percent of what he was paid, and we'll talk about that a little further," (AR 32-33), and ". . . his employer indicated . . . the claimant is perhaps performing at 25 percent of what's expected of other employees." (AR 65). Actually, Pastor Anderson said that Johnson's compensation was 25 percent more than the value of his work, not that his work was only worth 25 percent of his compensation. Importantly, no evidence contradicted or undermined the only conclusion that the record permits - namely, that Johnson's earnings from work at the church were subsidized. See Rostello, 529 F.3d at 1186 (noting that evidence established the presence of subsidies and the Appeals Council cited no evidence to undermine the conclusion that earnings were subsidized); Gloeckler v. Massanari, No. 4:00-CV-1897-A, 2001 U.S. Dist. LEXIS 17772, at *4 (N.D. Tex. 2001) (ALJ erred by failing to consider subsidy evidence, instead relying only on gross hours and gross earnings). Therefore, the Commissioner's conclusion - that Johnson engaged in SGA in 2004 and 2007 - is not supported by substantial evidence.

The Commissioner argues that if the ALJ erred with respect to the SGA determination, the decision still should be affirmed because Johnson's work activity was not the only factor considered in evaluating Johnson's credibility, as the ALJ considered the objective medical evidence (AR 22-

26), Johnson's activities of daily living (AR 23, 26), and Johnson's depression having improved with treatment (AR 24). As a result, according to the Commissioner, the ALJ's error was harmless. See Roberson v. Astrue, 481 F.3d 1020, 1025-26 (8th Cir. 2007) (upholding the ALJ's credibility evaluation even though he did not consider claimant's work record, because "the portions of the record that he referred to were sufficient to support his credibility determination."). However, in reference to the SGA determination, the ALJ stated, "this is the major basis for this denial, claimant performed substantial gainful activity in both 2004 and 2007. This ability, as well as earnings generated in 2003, 2005, 2006, and 2008 clearly reflects a capacity for full-time work within the parameters of the mental residual functional capacity noted above." (AR 25).

Alternatively, the Commissioner contends that the ALJ did not purport to deny Johnson's claim at step one of the sequential evaluation but rather gave Johnson the benefit of the doubt on step one by proceeding through step five of the sequential evaluation. In order to determine whether the ALJ's erroneous SGA determination was harmless, this Court must consider the ALJ's rulings at the subsequent steps in the sequential evaluation and Johnson's arguments regarding those matters.

## B. Severe Impairments Determination

An impairment is "severe" at step two of the five-step sequential analysis if it "significantly limits [an individual's] physical or mental abilities to do basic work activities." 20 C.F.R. § 404.1520(c); see also Bowen v. Yuckert, 482 U.S. 137, 141 (1987); SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996). The Supreme Court has adopted a "de minimus standard" with regard to step two of the sequential evaluation. Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989). Under this standard, "only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking the subsequent steps of the

-20-

sequential evaluation process." Id. (quoting Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987) (citing Yuckert, 482 U.S. at 158)). "Severity is not an onerous requirement for the claimant to meet, but it also is not a toothless standard, and [the Eighth Circuit has] upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007) (citations omitted).

The ALJ found that Johnson has the following severe impairments: organic mental disorder (borderline intellectual functioning with a verbal IQ of 84, performance IQ of 78, and full-scale IQ of 79), autism, depressive disorder, and anxiety disorder. (AR 20). Johnson claims that the Commissioner erred by failing to identify and consider all of his severe impairments. According to Johnson, the Commissioner should have found that Johnson's leg and foot condition and upper extremity and shoulder pain also constituted severe impairments.

### 1. Leg and Foot Condition

The ALJ addressed Johnson's leg and foot condition in the following manner:

> Claimant reported some leg pain due to leg length discrepancy. However, the claimant has received very little or no treatment for leg pain. Claimant's leg pain is non-severe as it is corrected by orthotics and special shoes.

(AR 20).

On April 27, 2005, Johnson informed Dr. Dendinger of periodic leg pain. (AR 277). Dr. Dendinger found Johnson had mild hyperreflexia in his leg reflexes. (AR 276-78). Johnson declined "a further evaluation on his feet" at that time. (AR 276).

On August 20, 2007, Dr. Shindler, a podiatrist at the Shindler Foot Clinic, found that Johnson experienced muscle weakness upon plantar flexion, dorsiflexion inversion, and eversion. (AR 374). Although such muscle weakness did not limit Johnson's range of motion at the ankles and subtalar

-21-

joints, Johnson demonstrated some limited range of motion in the midtarsal and metatarsophalangeal joints, indicating some arthritis. (AR 374). He had severe pronation upon gait testing bilaterally, and he experienced some pain upon palpation to the plantar aspect of his right and left arch. (AR 374).

Perhaps most significantly, Dr. Shindler noted a biomechanical imbalance in both feet due to limb length shortage on Johnson's left leg. (AR 374). Dr. Shindler's overall assessment included limb length shortage, pain, tendonitis, and arthritis. (AR 374-75). Dr. Shindler found that Johnson's biomechanical imbalance in both feet affects muscle strength and results in limited time standing and walking on his feet before experiencing pain. (AR 374-75). Dr. Shindler explained to Johnson that a job requiring standing "for long periods of time or doing a lot of walking" would cause pain in both feet, but he did not specify the severity of such pain or the amount of standing or walking that would cause such pain. (AR 375). In addition, Dr. Shindler recommended that prescription orthotics possibly could correct any biomechanical imbalance and reduce pain and inflammation. (AR 375). Johnson testified that he ceased wearing the prescription orthotics because they hurt his feet (AR 46) and that his feet would start throbbing after three to four hours of standing and walking. (AR 60). In response to a letter from Johnson's attorney prior to the administrative proceeding, Dr. Shindler noted that Johnson can stand for only 15-20 minutes before needing to sit down and can stand and walk for up to two hours in an eight-hour workday. (AR 376-77).

"[R]egulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)). Substantial evidence on the record as a whole does not support the Commissioner's decision that Johnson's leg and foot condition did not constitute a severe

-22-

impairment. The ALJ did not provide any reason for affording apparently no weight to Dr. Shindler's evaluation. Because medical records demonstrated leg and foot pain resulting from Johnson's leg length discrepancy and the ALJ failed to provide any reason for disregarding the treating physician's conclusion that Johnson could not work while standing for more than 15-20 minutes at a time or walking for more than two hours in one workday, the ALJ did not appropriately analyze whether Johnson's leg and foot condition constituted a severe impairment.

### 2. Upper Extremity and Shoulder Condition

Regarding Johnson's claim of upper extremity and shoulder pain, the ALJ concluded:

"claimant's allegations of upper extremity and shoulder pain are not medically determinable impairments. The record is void of a diagnosis related to his pain, nor does the record indicate the claimant has sought any treatment for such pain."

(AR 20).

This conclusion is not supported by substantial evidence on the record as a whole, as the ALJ's finding is factually incorrect. Upon examining Johnson on September 24, 2008, for reported right shoulder pain, Dr. Dendinger noted that he "suspect[s] this is very likely an overuse syndrome with excessive use of the shoulder and work is likely creating this difficulty." (AR 383). In addition, results of a September 24, 2008 x-ray of Johnson revealed that he suffered from "minimal AC and glenohumeral degenerative joint disease." (AR 402). Contrary to the ALJ's finding, Johnson on several occasions sought treatment for his upper extremity and right shoulder pain. (AR 277) (Johnson complained of periodic pain in his arms to Dr. Dendinger in April of 2005); (AR 276) (Dr. Dendinger found that Johnson had mild hyperreflexia in his arms); (AR 387-88, 391-92) (Johnson noted to Dr. Dendinger pain in his right forearm and "tennis elbow" in November of 2007); (AR 383-84, 402) (Johnson complained of bilateral arm discomfort to Dr. Dendinger in June and

-23-

September of 2008).

In his brief opposing Johnson's present motion, the Commissioner contended that Johnson's work activity[3] supported the ALJ's determination that Johnson's upper extremity and shoulder conditions were not severe. Johnson's work activity, however, was not the articulated basis for the ALJ's ruling. The basis for the ALJ's finding concerning whether Johnson's upper extremity and shoulder condition constituted a severe impairment was factually erroneous and not supported by substantial evidence.

## C. Residual Functional Capacity Determination

The ALJ found that Johnson retained the RFC for work at all exertional levels, with certain mental limitations. (AR 22-26). Mentally, the ALJ found that Johnson could understand, remember, and carry out short, simple instructions, interact appropriately with supervisors, co-workers, and the general public, respond appropriately to changes in a routine work setting, and make judgments on simple, work-related decisions. (AR 22).

RFC is an "administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical or mental activities." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). "RFC does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*." Id. An ALJ bears the primary responsibility to assess a claimant's RFC based on all relevant evidence. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Because "a claimant's residual functional capacity is

---

[3]At his job at Hy-Vee, Johnson's tasks included retrieving grocery carts from the parking lot, stocking groceries, cleaning bathrooms, vacuuming, bagging groceries, and picking up garbage off the floors. (AR 39).

a medical question . . . some medical evidence . . . must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (internal citations omitted). Although an ALJ is not limited to considering only medical evidence when evaluating RFC, the ALJ is "required to consider at least some supporting evidence from a professional." Id.

When a claim is made, the Social Security Administration is required to evaluate every medical opinion it receives, regardless of source. 20 C.F.R. § 404.1527(d). "[A]n ALJ should 'give good reasons' for discounting a treating physician's opinion." Dolph v. Barnhart, 308 F.3d 876, 878-89 (8th Cir. 2002) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). If a treating physician's opinion is not given controlling weight under 20 C.F.R. § 404.1527(d)(2), it must be weighed considering the factors in 20 C.F.R. § 404.1527(d)(2)-(6). See Shontos v. Barnhart 328 F.3d 418, 426 (8th Cir. 2003). "The Eighth Circuit Court of Appeals requires an ALJ to consider all evidence in the record when determining a claimant's residual functional capacity." Potter v. Astrue, No. 07-05050, 2008 U.S. Dist. LEXIS 39928, at *10 (W.D. Mo. 2008) (citing Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001)). Under 20 C.F.R. § 404.1527(d)(2)-(6), when deciding the weight given to a medical opinion that is not given controlling weight, the ALJ must consider each of the following factors: (1) the examining relationship; (2) the treatment relationship, including length of treatment, frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) any other factors brought to the ALJ's attention tending to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ did not adequately address various medical evidence in determining Johnson's RFC, and the RFC determination was interwoven with the erroneous SGA determination. As a result, this

-25-

Court is unable to review whether the ALJ's RFC determination was based on appropriate grounds.

Johnson contends that the ALJ erred by not evaluating the opinion of Dr. Shindler, who diagnosed Johnson with limb length shortage, pain, tendonitis, and arthritis, and who described Johnson's foot condition as a biomechanical imbalance in both feet that affects muscle strength and results in limited time standing and walking prior to the onset of pain.   In response, the Commissioner argues that Dr. Shindler's opinions were adequately addressed by the ALJ's finding that Johnson received "very little or no treatment for leg pain." (AR 20).   Moreover, the Commissioner notes that Johnson only sought treatment for leg and foot pain on two occasions and only saw Dr. Shindler once, and the Commissioner argues that as a result Dr. Shindler's opinions may be disregarded. In support, the Commissioner cites Randolph v. Barnhart, 386 F.3d 835 (8th Cir. 2004), in which the Eighth Circuit found that because a physician had only seen the claimant three times, "[t]he treatment notes from these sessions do not indicate that [the physician] had sufficient knowledge upon which to formulate an opinion as to [claimant's] ability to function in a workplace." Id. at 840. In Randolph, however, the ALJ explained his rationale for not giving a particular physician's opinion controlling weight. Id. at 839 (noting that the "ALJ did not give [physician's] opinion controlling weight because 'the weight of all the objective medical evidence of record, including from the mental health clinic, does not support [physician's] opinion that claimant is unable to work.'"). Id. The Commissioner further contends that Dr. Shindler's opinion that Johnson could stand only for 15-20 minutes at a time and stand or walk for less than two hours in an eight-hour workday occurred approximately one year after last seeing Dr. Shindler, citing Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001), in support. Id. at 178 (finding that the fact that the treating physician's statement of disability was communicated a year after he last saw claimant for

treatment allowed the ALJ to assign that physician's opinion lesser weight). However, unlike in Mastro, the ALJ in this case failed to weigh Dr. Shindler's opinion at all. The Commissioner further argues that Johnson's work activity and level of functioning after the alleged disability onset date were inconsistent with Dr. Shindler's opinion. Again, however, the ALJ did not indicate that this was the basis under which he disregarded Dr. Shindler's opinion, and this Court will not speculate as to the basis for the ALJ's finding. See Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001) (noting that "[a] reviewing court may not uphold an agency decision based on reasons not articulated by the agency, when the agency has failed to make a necessary determination of fact or policy.") (internal citations omitted).

Johnson argues that the ALJ also erred in evaluating the report of Dr. Van Kley. The ALJ's ruling did not state what weight, if any, was given to Dr. Van Kley's report. Specifically, the ruling did not weigh Dr. Van Kley's findings that Johnson had borderline intellectual functioning, difficulty using common sense to recognize social conventions, trouble problem-solving in novel situations, limited capacity to find appropriate and adaptive solutions to everyday problems, anxiety in situations involving critique of his performance, that Johnson was best suited for jobs with considerable repetition and minimal need for novel problem solving, and that Johnson needed written instructions when learning new employment responsibilities. The Commissioner argues that the weight given to Dr. Van Kley's opinions is incorporated into the ALJ's findings that Johnson could understand, remember, and carry out short, simple instructions, interact appropriately with supervisors, co-workers, and the general public, respond appropriately to changes in a routine work setting, and make judgments on simple work-related decisions. (AR 22-26). None of these findings, however, indicate why the ALJ gave no or little weight to Dr. Van Kley's opinions. Absent such an

-27-

explanation, this Court is unable to determine whether the medical opinions received proper consideration or whether the evaluation was tainted by the erroneous SGA determination.

In addition, Johnson argues that the ALJ erred in evaluating the reports of the state agency physicians and psychologists. Regarding Johnson's mental RFC, the ALJ's decision noted that the state agency experts found Johnson's mental RFC consistent with Johnson's past work. (AR 25) (citing to the initial state agency physical and mental RFCs). The second state agency mental RFC evaluation (AR 368-69), which found additional moderate limitations in the areas of accepting instructions and responding appropriately to criticism from supervisors, as well as Johnson's ability to respond to changes in the work environment, was not mentioned in the ALJ's decision. The ALJ noted that he relied on the state agency opinions when assessing Johnson's social functioning, but the ALJ did not explain the contradiction between relying on the state agency's mental RFCs - which stated that Johnson can perform his past work - and the ALJ's finding that Johnson's RFC does not allow him to perform his past work. (AR 21). This unexplained contradiction in the ALJ's reasoning recurred when the ALJ stated "there really has been no deterioration in his mental ability to perform substantial gainful activity as he did in the past," then two paragraphs later stated that "the demands of the claimant's past work exceed his determined residual functional capacity." (AR 26). The Commissioner contends that the contradiction is harmless because, regardless of whether the ALJ accepted the state agency findings or not, the ALJ found that Johnson could perform SGA and therefore was not disabled. However, as discussed above, this argument is predicated upon the ALJ's erroneous conclusion that Johnson engaged in SGA in 2004 and 2007. In short, the ALJ's conclusions regarding Johnson's mental RFC are not stated in a manner sufficient to permit an informed review by this Court.

-28-

It appears that, as the ALJ stated, the major basis for the ruling was not medical evidence, but rather Johnson's earnings history. (AR 25). As discussed above, however, the ALJ failed to consider undisputed evidence of significant subsidies.

**D. ALJ's Credibility Assessment Concerning Johnson's Subjective Complaints**

A district court "defers to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006). Factors to be considered by the ALJ in evaluating subjective complaints of pain and other symptoms include the five "Polaski factors":

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication; and
5. functional restrictions.

Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ "is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered." Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004). Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. Polaski, 739 F.2d at 1322. An ALJ may discount subjective complaints of pain or other symptoms if inconsistencies exist in the evidence as a whole. Id.; see also Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

An ALJ need not explicitly discuss each Polaski factor, but an ALJ who rejects subjective complaints "must make an express credibility determination explaining the reasons for discrediting the complaints." Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (internal citations omitted). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the

-29-

courts." Id. (quoting Pearsall, 274 F.3d at 1218). The credibility determination "is sufficient if [the ALJ] acknowledges and considers [the Polaski] factors before discounting a claimant's subjective complaints." Goff v. Barnhart, 421 F.3d 785, 791-92 (quoting Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The Commissioner's regulations require that "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Failure by an ALJ to properly comply with Polaski constitutes reversible error. See Pettijohn v. Heckler, 759 F.2d 669 (8th Cir. 1985).

After the RFC determination, the ALJ found at step four that Johnson is not capable of performing his past relevant work as a janitor. (AR 26). The burden thus shifted to the Commissioner to prove "first that the claimant retains the RFC to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that claimant is able to perform." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (citing Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001)); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Johnson argues that the ALJ failed to meet this burden because the administrative ruling failed to acknowledge the Polaski factors, failed to apply them to this case before discrediting Johnson's subjective complaints of pain, and failed to make a valid credibility finding. According to Johnson, the ALJ's credibility finding instead consisted merely of a conclusory statement: ". . . the claimant's stat ements concerning the intensity, persistence and limiting effects of these

symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 26). On the other hand, the Commissioner notes that the ALJ's conclusory statement is preceded by consideration of Johnson's subjective complaints and a credibility assessment exploring - though not expressly - the Polaski factors on AR 22 through 26. This credibility assessment, however, is inextricably intertwined with the legally erroneous SGA determination on AR 25, and the ALJ expressly considered the improper SGA determination in assessing Johnson's credibility. The record is unclear whether the ALJ would have made the same ruling absent the erroneous SGA determination - which the ALJ stated was "the major basis for this denial" - and this Court may not uphold the administrative ruling based on reasons not articulated by the agency or the Commissioner's post-hoc explanations for such unexplained conclusions. Under the circumstances, the ALJ's ruling is not sufficiently clear to allow an informed review by this Court of whether a complete and properly rendered credibility determination concerning Johnson's subjective complaints would have resulted in denial of Johnson's claim.

## V. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Order of the Commissioner is vacated and this action is remanded to the Social Security Administration for the purpose of determining, consistent with this opinion, whether Plaintiff Sidney Johnson's leg and foot condition and upper extremity and shoulder condition constitute severe impairments, what Johnson's residual functional capacity is based on an evaluation and weighing of all medical opinions in the record, and whether Johnson's subjective complaints of pain and other symptoms are credible in light of all of the above. It is further

ORDERED that the decision that Plaintiff Sidney Johnson engaged in substantial gainful

activity in 2004 and 2007 is reversed and remanded to the Social Security Administration for the purpose of determining whether Johnson in fact engaged in substantial gainful activity following the alleged disability onset date of March 12, 2002, bearing in mind the evidence in the record that Johnson received wage subsidies and special accommodations.

Dated March 16, 2011.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE